# EXHIBIT B



Transcript of the Testimony of

**KRISTIN JARAMILLO**

April 04, 2022

**GENEVIEVE EVANS**

*vs*

**GUITAR CITY STORES and FILIP TODOROVSKI**

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

```
 1      A.   Did I prepare it personally?
 2      Q.   Uh-huh.
 3      A.   No.
 4      Q.   Do you know who did?
 5      A.   Prepare it?  No.
 6      Q.   Okay.  Is this distributed to every
 7  perspective employee of Guitar Center?
 8      A.   Not every perspective employee.  Everyone
 9  that is receiving an offer of employment.
10      Q.   Have you signed one of these?
11      A.   Yes, I have.
12      Q.   Okay.  Did you submit an electronic
13  signature?
14      A.   Yes, I did.
15      Q.   Okay.  What program did you use to
16  electronically sign that document?
17      A.   It's through ADP.  It's their services.
18  It's the ATS, the applicant tracking system, which
19  also serves the onboarding function.
20      Q.   Did you say ADP?
21      A.   ADP.
22      Q.   Is that a third-party company that you
23  contract with?
24      A.   It is a third-party company.  I'm sorry.
```

GENEVIEVE EVANS vs
GUITAR CITY STORES and FILIP TODOROVSKI                    KRISTIN JARAMILLO

Page 22

1   A.  Yes.
2   Q.  So it would expire within two days, right?
3   A.  Yes.
4   Q.  Okay.  So would it expire as of May 10,
5   2019?
6   A.  Yes, it may, if nothing is done.
7           MR. RIESER:  Let me pull this
8       document.  All right.  Can you pull up
9       Guitar Center Evans-62, please?  I know
10      it's a little tiny.
11          THE WITNESS:  You are going to
12      have to super-size it for me, please.
13  BY MR. RIESER:
14  Q.  I'm sorry.  What did you say?
15  A.  I can see that.  Thank you.
16  Q.  Okay.  Great.  All right.  So have you
17  ever seen this document before?
18  A.  Yes, I have.
19  Q.  Okay.  And what is this?
20  A.  This is the footprints of what is in the
21  ADP system.
22  Q.  Do you have access to the ADP system?
23  A.  I do.
24  Q.  Is it housed on Guitar Center computer

 1  systems or servers?
 2      A.  It's an Internet-based system.  It's not
 3  how we access through ADP.  It's not software.
 4      Q.  Okay.  Go you.  And do you have your own
 5  individualized log-in information?
 6      A.  Everyone does.
 7      Q.  You are not on here, right, in this list?
 8      A.  Not of this document.
 9      Q.  Is this always on the document or did
10  somebody manually plug that?
11      A.  You can't manually plug this in.  It's the
12  footprint of who logs in.  It's keystroke.  ADP
13  owns this document.  We can access it, but we
14  can't manipulate it.
15      Q.  Got it.  All right.  Even this table here,
16  this list of names?
17      A.  That is outside of the footprints of the
18  document.
19      Q.  This was added on after the fact?
20      A.  I don't know when this was added on, but
21  this is not part of the footprint.
22      Q.  Do you know who added that on?
23      A.  I do not.
24      Q.  Or when it was added on?

1  applicant that made that change, right?
2      A.  Well, it would depend on the action that
3  is being taken.  There are some actions that are
4  part of the work flow, that are triggered by the
5  move that the applicant makes.
6      Q.  Okay.  But you are seeing the letters ATS.
7  There would be no way to determine or approve it
8  was a system move or the applicant, correct?
9      A.  No, because there is a work flow that is
10 set up.  The system can't create the next step
11 until the applicant takes certain moves.
12     Q.  I understand.  I understand you are saying
13 that.  But is there any independent way to verify
14 whether it was a system move or the applicant?
15     A.  Yes.  One would only need to look at our
16 work flow to see how the system is designed.  The
17 system is designed to take action after the
18 applicant has taken certain actions.  It doesn't
19 take it on behalf of an applicant.  It's systemic.
20     Q.  All right.  Would you be able to look at
21 the metadata and determine what IP address the
22 change came from, right?
23     A.  I'm sorry.  Can you rephrase your
24 question?

1  is systemic.  Again, it could be something that is
2  the req is being updated or the system, there's
3  maintenance on the requisition.
4       Q.  You keep using the word "systemic."  Could
5  you just describe that or define that for me?
6       A.  Yes.  Everything is set up in a work flow.
7  So the system has a work flow that is coded into
8  the system.
9            So if there is actions taken, if a req is
10 being opened or updated, the system then responds
11 with whatever action is appropriate for what has
12 been -- what action has been taken.
13      Q.  And the person making the changes is
14 indicated by the three initials in the left,
15 right?
16      A.  Correct.
17      Q.  Okay.  And again, that could be either the
18 system or the applicant, right?
19      A.  Well, depending on what the action is,
20 yes.  There are some actions that the applicant
21 can make.  And there are some actions that the
22 system can take.  And that's the work flow.
23      Q.  Okay.  And how would you determine whether
24 or not -- when you say "work flow," is that

 1  offer, when the offer letter is presented, there
 2  are two big buttons.  One says, "I accept."  The
 3  other says, "I decline."  And they have to type in
 4  their name and select one.
 5           And the name that appears here is the name
 6  that they type in and bop, either "I accept" or "I
 7  decline."
 8       Q.  Okay.  Do you have a copy of that?
 9       A.  Not for her.
10       Q.  You have it for other people?
11       A.  No.  No.  But I could -- I have a screen
12  print of what it looks like.  This is how it
13  appears in the footprint.
14       Q.  Right.  But you don't have it for
15  Ms. Evans though, right?
16       A.  I have the footprint.  Those actions are
17  what generates this footprint.
18       Q.  But the e-mail or the document with the
19  box, where she types on her name, clicks with the
20  button, you don't have that, do you?
21       A.  I have the footprint, which is the same
22  thing.  If she declined, it would stop the work
23  flow immediately.  Nothing further would happen.
24       Q.  But when you say "the footprint," you are

1 column for background checks?

2    A.  It populates in the column for background
3 checks.  And I'm sorry.  I still don't understand
4 your question.

5        Depending upon what action the system
6 takes next, it could either be on the right or the
7 left-hand column.  So it will say "e-signature
8 accepted" if that's the action that's taken.

9    Q.  Taken by whom?

10    A.  The applicant.  And in this case, the
11 candidate.

12    Q.  Okay.  So under 1027, all of these
13 designated as ATS, is that all the applicant?

14    A.  Some of them may be systemic.  So if you
15 see here at 10:26 a.m., that is when she clicks
16 on -- and when I say "she," I'm assuming it's
17 Ms. Evans -- clicks on the e-mail that was sent to
18 her from ADP.

19        So she clicks on the e-mail with the
20 offer.  She would then have to log in to ADP in
21 order to open the offer letter.  And that was at
22 10:26.  So you can see that's when the offer was
23 extended.

24    Q.  Okay.

```
 1                         - - -
 2                  (Whereupon, the following
 3   discussion was held off the record.)
 4                         - - -
 5   BY MR. RIESER:
 6       Q.   All right.  Really quickly, Rebecca.  Can
 7   you pull that document back up?  Okay.
 8            So besides this DOF accepted OF Esig
 9   status, OF Esig signature Genevieve Evans, is
10   there anything else that you would point to, to
11   prove that Ms. Evans agreed to the arbitration
12   agreement that we looked at earlier?
13       A.   Well, yes, because the background process
14   is kicked off when someone clicks on the offer and
15   they say, "I accept."
16            There is an automatic work flow that
17   begins and only can begin when someone accepts the
18   offer.  And that's one of the administrative
19   functions that I oversee are background checks.
20            So we cannot place someone into a
21   background check until they have consented to the
22   background, and that happens when they accept the
23   offer.
24       Q.   But you would agree that, that e-signature
```

 1   that we looked at earlier was just solely limited
 2   to the background check, right?
 3           I understand what you are saying, that
 4   your contention is they had never gotten to the
 5   background check if they didn't agree to the
 6   background letter.
 7           But my question is solely about the
 8   e-signature.  That's just to agree to the
 9   background check, right?
10       **A.   The offer e-signature Genevieve Evans at**
11   **10:27 is when she accepted the offer, where it**
12   **says "OF offer."**
13       Q.   Okay.  So but the e-signature of the
14   background check is not her agreeing to the
15   arbitration agreement, correct?
16       **A.   That is her agreeing to the background**
17   **consent form, which is kicked off after one agrees**
18   **to the offer.**
19       Q.   I understand.  Besides that, is there
20   anything else that you would point to, to
21   demonstrate that she agreed to the arbitration
22   agreement?
23       **A.   If she did not agree to the arbitration**
24   **agreement, there would be nothing else in her**

 1  footprint.  The work flow would automatically
 2  stop.
 3       Q.  Okay.  But my question is only --
 4       **A.  It only continues when they agree to the**
 5  **offer.**
 6       Q.  Okay.
 7       **A.  It automatically stops if they decline.**
 8       Q.  Have you ever seen her have an electric
 9  signature directly accepting the arbitration
10  agreement?
11       **A.  I'm sorry.  Can you repeat your question?**
12  **I didn't hear the first part.**
13       Q.  Sure.  Have you ever seen or do you know
14  if it exists e-signature from Genevieve Evans
15  agreeing explicitly to the arbitration agreement
16  program?
17       **A.  It is part of the process when she is**
18  **accepting the offer that she types in her name and**
19  **that's where you see it in OF.  She has to type in**
20  **her name and press "accept."  And that's what that**
21  **is.**
22       Q.  Okay.  I understand.  My question is
23  limited to the arbitration agreement.  Is there
24  any entry in any of these documents that talks

 1  The offer of an offer, how about that?
 2       Q.  Got it.
 3       A.  It's the e-mail indicating that there is
 4  an offer letter, waiting for you in the ADP
 5  system.  Click here to view your offer letter.
 6  And then when you follow the hyperlink, it takes
 7  you to the ADP system.
 8           But you have to log in and put your
 9  password in.  And then there is a screen that
10  shows -- that has the job to which one applies.
11  And then it will say, "Congratulations.  Click
12  here."  And that would take you to your offer
13  letter.
14       Q.  Okay.  Do you know when her first day was?
15       A.  I don't.
16       Q.  Would an interview take place prior to
17  this letter being generated, if you know?
18       A.  What kind of an interview?
19       Q.  Well, what is the hiring process there at
20  the Guitar Center?  Are they required to have an
21  inperson interview or not?
22       A.  Well, the Guitar Center in music and arts
23  are two different entities.  So they may have had
24  a phone interview first and then an inperson

1  interview.  So I can't say what their exact
2  process was in 2019.  I'm not sure.
3       Q.  Okay.  Now, when they click on it, so you
4  get the offer to the offer.  You click on the link
5  and then this pops up; is that what you are
6  saying?
7       A.  No.  When you click on the link, it takes
8  you to the ADP platform and one has to log on.
9       Q.  Okay.
10      A.  With the user name and password.  And then
11 it takes -- it takes the candidate to a screen
12 that shows that if they apply for three different
13 jobs, that might show the three different jobs.
14           But under the job to which they are being
15 offered, there would be a congratulatory message,
16 saying, "Please click here" with an arrow.  And
17 that takes them to the letter.
18      Q.  Okay.  And so the offer letter ends with
19 regards to the key, right?
20      A.  I'm sorry.  I didn't see -- I think the
21 arbitration agreement is part of the offer.  It
22 looks like that's Page-7 of 11.
23      Q.  Well, don't pay attention to those.
24 Because they are -- that is the pagination for the

1  brief that your employer submitted to The Court.
2  So that doesn't really mean anything.  But this
3  offer letter ends here with the signature regards
4  to the rosskey?
5      **A.  Well, no, because it says -- it includes**
6  **your acceptance of this offer and signature to the**
7  **arbitration program agreement.**
8      Q.  Yeah.  Your acceptance of this offer.  So
9  then this is the offer, right?
10     **A.  Yes.**
11     Q.  Okay.
12     **A.  But the arbitration agreement is part of**
13  **the offer.**
14     Q.  Now, is this a separate document that they
15  have to click on to or is it pulled up
16  automatically?  I'm sorry.  I didn't hear your
17  answer.
18     **A.  It's all one document.  There may be a**
19  **page break.  But it's all one document.**
20     Q.  Is it in PDF form?
21     **A.  They can download it as a PDF, yes.**
22     Q.  How about when they are accessing it
23  through the ADP system?
24     **A.  They can download it as a PDF.**

```
 1      Q.  Okay.  So when they click in, they get the
 2   offer to the offer.  They click on that.  They log
 3   in.  Then they open this.  And then is it this
 4   document?  And then immediately thereafter this
 5   document, the arbitration program agreement?
 6      A.  I'm so sorry.  They click on this
 7   document.  And what was the last part of your
 8   question?
 9      Q.  So you read through this letter.  And then
10   the very next document is this arbitration program
11   agreement?
12      A.  Yes, all one document.
13      Q.  It's all one document?  There is no
14   additional clicking that needs to occur?
15      A.  No.
16      Q.  Okay.  There is no signature line in here,
17   right?
18      A.  No.  There is a pop-up window that says "I
19   accept" or "decline."  And they have to type in
20   their name.  And they are big buttons.  The "I
21   accept" has a green check mark and the "I decline"
22   has a red X.
23      Q.  Have you ever had somebody decline?
24      A.  Yes, decline offers, yes.
```

```
 1                        - - -

 2               C E R T I F I C A T I O N

 3                        - - -

 4            I, Amanda Brooks, a court reporter and

 5   commissioner of deeds, do hereby certify that the

 6   proceedings and evidence are contained fully and

 7   accurately in the stenographic notes taken by me

 8   on Monday, April 4th, 2022, and that the foregoing

 9   testimony was taken in shorthand by myself and

10   reduced to typing under my direction and control

11   and that this is a correct transcript of the same.

12                        /s/ Amanda Brooks

13                        AMANDA BROOKS

14                        Professional Court Reporter

15                        Commissioner Of Deeds

16                        Notary Number: 1257676

17                        Notary Expiration: 3/21/2026

18

19                        --------------

20            (The foregoing certification of this

21   transcript does not apply to any reproduction of

22   the same by any means, unless under the direct

23   control and/or supervision of the certifying

24   shorthand reporter.)
```